**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------X
TRADEWINDS AIRLINES, INC.,       :

              <u>Plaintiff</u>,     :    No. 08 Civ. 5901 (JFK)

      -against-           :     **<u>OPINION & ORDER</u>**

GEORGE SOROS and PURNENDU      :
CHATTERJEE,
                          :
              <u>Defendants</u>.
----------------------------------X


For Plaintiff TradeWinds Airlines, Inc.:

     Violet Elizabeth Grayson, Esq.
     270 Ninth Avenue
     San Francisco, CA 9418


For Defendant George Soros:

     Raymond Fitzgerald, Esq.
     David J. McCarthy, Esq.
     Butler, Fitzgerald, Fiveson & McCarthy
     36 West 44th Street, Suite 816
     New York, NY 10036


**JOHN F. KEENAN, United States District Judge**

**JOHN F. KEENAN, United States District Judge:**

## I. <u>INTRODUCTION</u>

Plaintiff TradeWinds Airlines, Inc. ("TradeWinds"), holds a $54.87 million default judgment in North Carolina state court against C-S Aviation Services, Inc. ("C-S Aviation"). It brings this action to pierce the corporate veil of C-S Aviation and recover the default judgment from the company's alleged alter egos, defendants George Soros ("Soros") and Purnendu Chatterjee ("Chatterjee").

This action currently is stayed pending a motion by C-S Aviation in North Carolina state court to vacate the judgment. <u>See</u> <u>Tradewinds Airlines, Inc. v. Soros</u>, No. 08 Civ. 5901 (JFK), 2009 WL 435298 (S.D.N.Y. Feb. 23, 2009). The stay has been partially lifted for the purpose of resolving the instant disqualification motion. <u>Id.</u> at *4. Soros moves to disqualify plaintiff's attorney, Violet Elizabeth Grayson, Esq. ("Grayson"), on the grounds that her participation in this case violates a protective order and a settlement agreement she signed during a prior veil-piercing action against Soros and Chatterjee. For the reasons below, the motion is DENIED.

## II. BACKGROUND

A.  The Prior Veil-Piercing Action

From 2001 until 2003, Grayson represented a company called Jet Star Enterprises ("Jet Star") against C-S Aviation and another defendant in a breach of contract action ("Jet Star I"). See Jet Star Enters. v. CS Aviation Services, No. 1:01-cv-6590 (DAB) (S.D.N.Y. filed July 19, 2001).  Ultimately, Jet Star obtained a default judgment against C-S Aviation in the amount of $3,432,867.

In 2005, Grayson brought a second action on behalf of Jet Star ("Jet Star II"), naming Soros, Chatterjee, and six other parties as defendants. See Jet Star Enters. v. Soros, No. 1:05-cv-6585 (HB) (S.D.N.Y. filed July 20, 2005).  Among the claims Jet Star asserted was one to pierce C-S Aviation's corporate veil and hold Soros and Chatterjee personally liable for the default judgment obtained in Jet Star I.  The case was assigned to United States District Judge Harold Baer, Jr.

All parties to Jet Star II and their counsel executed a Stipulation and Protective Order Governing the Use of Confidential Material (the "Protective Order"), which was "so ordered" by the court.[1] (See Fitzgerald Aff. Ex. F.)  The Protective Order provided that "Litigation Materials"—defined

_____

[1]    A protective order also was entered in Jet Star I.  That order contained terms substantially equivalent to the one entered in Jet Star II and will not be discussed separately.

broadly to include anything produced during or derived from discovery—were to "be used by the parties solely for the prosecution and defense of [Jet Star II], and not for any other purpose." (Id. ¶¶ 1-2.)   The order permitted any party to designate as "confidential" any "non-public" Litigation Materials containing trade secrets or commercially-sensitive information. (Id. ¶ 3.)   Litigation Materials designated as confidential could not be disclosed to third parties. (Id. ¶ 4.) If filed with the Court, they were supposed to be filed under seal unless otherwise agreed. (Id. ¶ 11.)

The Protective Order further provided that, after the conclusion of Jet Star II, all Litigation Materials were to be destroyed or returned to the party that produced them. (Id. at ¶ 12.)   However, counsel could retain copies of all deposition transcripts, work product, and papers filed with the Court. (Id.)   The provisions of the Protective Order were to continue in force without end "insofar as they restrict the disclosure and use of Confidential Litigation Material." (Id. at ¶ 6.)

In spring 2006, after the close of discovery, all remaining defendants moved for summary judgment.   Soros filed his motion papers publicly on PACER/ECF, attaching numerous exhibits and deposition transcripts that were marked as confidential. (See Docket Entry Nos. 63-83, 98-100, Jet Star

Enters. v. Soros, No. 1:05-cv-6585 (HB) (S.D.N.Y.).  Grayson electronically filed Jet Star's opposing memorandum of law and Rule 56.1 statement and sent a hard copy of the exhibits to Judge Baer's chambers. (Id. Nos. 93-94, 102; Grayson Sur-Reply Decl. ¶ 2.)  The opposition papers contained many confidential materials. (Fitzgerald Reply Aff. ¶¶ 5-6, Ex. P.)  Neither party sought to have its papers filed under seal.

On August 9, 2006, Judge Baer issued an opinion and order (the "Jet Star II Opinion") granting defendants summary judgment on all claims except the veil-piercing claim against Soros and Chatterjee. See Jet Star Enters. v. Soros, No. 1:05-cv-6585 (HB), 2006 WL 2270375 (S.D.N.Y. Aug. 9, 2006).  The opinion contains a detailed summary of the evidence produced in discovery that, the court found, "suffice[d] to create triable issues of fact regarding whether Soros and Chatterjee operated CS Aviation as an alter ego." Id. at *7.  Trial of the veil-piercing claim was scheduled to begin on September 11, 2006.

On or about August 22, 2006, the parties and their counsel entered into a Settlement and Confidentiality Agreement, (the "Settlement Agreement"). (Fitzgerald Aff. Ex. G.)  In it, the parties settled the veil-piercing claim.  They and their counsel agreed to keep confidential "the existence, provisions and substance of this Agreement, and the claims for relief sought against Mr. Soros and/or Dr. Chatterjee and the bases or

asserted bases therefore," and not to disclose that information "to any person or entity for any purpose." (<u>Id.</u> ¶ 3.A.)  The Settlement Agreement further provided that the parties and their attorneys "may disclose the fact that this action has been settled (but may not disclose the terms hereof) and state in substance that such person is not at liberty to disclose the terms of the agreement." (<u>Id.</u> ¶ 3.B(i).)  If plaintiff or its counsel breached these confidentiality provisions, the breaching party would have to repay the portion of the settlement received by it or her. (<u>Id.</u> ¶ 3.C.)  The agreement contained no restriction on Grayson's ability to represent clients in future litigation against Soros or Chatterjee.

On August 29, 2006, Judge Baer signed and filed an order stating that "the matter has been settled," "the parties have executed a stipulation of discontinuance," and that the "stipulation has been filed under seal." (<u>See</u> Docket Entry No. 106, <u>Jet Star Enters. v. Soros, Chaterjee et al.</u>, No. 1:05-cv-6585 (HB) (S.D.N.Y. filed Aug. 29, 2006)).

After the settlement of <u>Jet Star II</u>, Grayson claims to have destroyed all Litigation Materials produced during discovery, but retained in the basement of her home copies of deposition transcripts, attorney work product, and papers filed with the Court, all in conformity with the Protective Order.

B.  **The Instant Action**

On June 27, 2008, TradeWinds obtained a $54.87 million default judgment against C-S Aviation in North Carolina state court.[2]  TradeWinds was represented in North Carolina by the law firm of Tuggle Duggins & Meschan ("Tuggle Duggins").  About ten weeks earlier, on April 10, 2008, TradeWinds had retained Grayson for the purpose of commencing the instant action to pierce C-S Aviation's corporate veil and hold Soros and Chatterjee liable for the default judgment. (See Fitzgerald Aff. Ex. J.)  The retainer agreement resulted from negotiations between her and Tuggle Duggins.  The agreement acknowledges that Grayson has "unique expertise" because she "previously represented another airline in a Southern District of New York action to pierce the corporate veil of C-S Aviation to reach Soros and Chaterjee." (Id. at 2.)  Her contingency fee is 25% of whatever portion of the $54.87 million judgment TradeWinds can

---

[2]  Further information about the North Carolina case and C-S Aviation's pending motion to vacate the default judgment is provided in a prior decision. See TradeWinds Airlines, 2009 WL 435298, at *1-2. Recently, the judge presiding over the North Carolina case, the Honorable Ben F. Tennille, issued a decision finding that extraordinary circumstances likely will require the judgment to be set aside, but reserving decision on the matter. See Deutsche Bank Trust Co. Americas v. Tradewinds Airlines, Inc., No. 03 CVS 12215, 2009 WL 1154861, at ¶ 6 (N.C. Super. Ct. Apr. 29, 2009).  Judge Tennille identified certain unscrupulous behavior by TradeWinds in pursuit of the default judgment. Id. ¶¶ 72-73.  That behavior is not relevant to the instant motion.  The sole basis for this motion is Grayson's alleged violation of her confidentiality obligations arising from the Jet Star litigation.

recover in this action. (<u>Id.</u> at 1.)

Grayson commenced this action on June 30, 2008. She affirms in a declaration that, "In preparing [the] Complaint, in preparing all subsequent papers in this case, and in otherwise conducting the business of this case, I have made no use of any confidential documents produced to me during the <u>Jet Star</u> Litigation, and have relied exclusively upon the extensive documentation which is a matter of record." (Grayson Decl. ¶ 16.) Soros is represented by the same law firm that represented him in <u>Jet Star II</u>.

A short time after this case commenced, TradeWinds went into bankruptcy. It filed two applications, first in Chapter 11 and then in Chapter 7, for the bankruptcy court to approve Grayson's retention in the instant case. (Fitzgerald Aff. Exs. K, N.) In the applications, TradeWinds disclosed that Grayson had "previously successfully litigated" <u>Jet Star II</u>, had "unique knowledge of the facts which resulted in the successful prosecution" of that case, and had concluded her representation of plaintiff in that case with a "favorable settlement." In support of the applications, Grayson filed a declaration attesting to her "prior unique experience with litigation in the [Southern District of New York] to pierce the [c]orporate veil of C-S [Aviation] to reach its principals." (Fitzgerald Aff. Ex.

K ¶ 17.)  The bankruptcy court approved the applications.

On February 2, 2009, Soros filed this motion to disqualify Grayson as counsel on the grounds that her representation of plaintiff violates the Protective Order and the Settlement Agreement.  Oral argument on the motion was heard on April 9, 2009.

### III. <u>DISCUSSION</u>

**A.  General Legal Standards**

Federal courts have inherent authority to disqualify attorneys in pending litigation when necessary to "'preserve the integrity of the adversary process.'" <u>Hempstead Video, Inc. v. Vill. of Valley Stream</u>, 409 F.3d 127, 132 (2d Cir. 2005) (quoting <u>Bd. of Educ. v. Nyquist</u>, 590 F.2d 1241, 1246 (2d Cir. 1979)).  "Motions to disqualify are generally not favored.  They are often tactically motivated; they cause delay and add expense; they disrupt attorney-client relationships sometimes of long standing; in short, they tend to derail the efficient progress of litigation." <u>Felix v. Balkin</u>, 49 F. Supp. 2d 260, 267 (S.D.N.Y. 1999) (internal citation omitted).  The decision to disqualify is committed to the sound discretion of the trial court. <u>Cresswell v. Sullivan & Cromwell</u>, 92 F.2d 60, 72 (2d Cir. 1990).  The exercise of that discretion requires a balancing of a party's "right freely to choose his counsel" against "the need

to maintain the highest standards of the profession." Hempstead Video, 409 F.3d at 132 (quoting Gov't of India v. Cook Indus., Inc., 569 F.2d 737, 739 (2d Cir. 1978).

The balance struck in the Second Circuit reflects a "restrained approach that focuses primarily on preserving the integrity of the trial process." Armstrong v. McAlpin, 625 F.2d 433, 444 (2d Cir. 1980), rev'd on other grounds, 449 U.S. 1106 (1981); see also Bottaro v. Hatton Assocs., 680 F.2d 895, 896 (2d Cir. 1982). Disqualification is appropriate only if the attorney's misconduct "tends to 'taint the underlying trial' by affecting his or her presentation of the case." Nyquist, 590 F.2d at 1246 (quoting W.T. Grant Co. v. Haines, 531 F.2d 671, 678 (2d Cir. 1976)). "The business of the court is to dispose of litigation and not to act as a general overseer of the ethics of those who practice here unless the questioned behavior taints the trial of the cause before it." W.T. Grant, 531 F.2d at 677; Nyquist, 590 F.2d at 1246.

Consistent with a restrained approach, and with "rare exceptions," courts in the Second Circuit have recognized only two situations in which an attorney's misconduct will taint the trial. Nyquist, 590 F.2d at 1246. The first is where the attorney or his firm concurrently represents parties with adverse interests, undermining the undivided loyalty required by Canon 5 of the New York Code of Professional Responsibility (the

"New York Code").[3] Id.; Cinema 5 Ltd. v. Cinerama, Inc., 528 F.2d 1384 (2d Cir. 1976); Fund of Funds, Ltd. v. Arthur Andersen & Co., 567 F.2d 225 (2d Cir. 1977); Med. Diagnostic Imaging, PLLC v. CareCore Nat'l, LLC, 542 F. Supp. 2d 296, 306 (S.D.N.Y. 2008).  The second, more common situation is where the attorney is in a position to use in litigation against a former client relevant, privileged information obtained during the prior representation, in violation of the attorney's duty to protect client confidences under Canon 4. Nyquist, 590 F.2d at 1246; Evans v. Artek Sys. Corp., 715 F.2d 788, 791 (2d Cir. 1983); Cheng v. GAF Corp., 631 F.2d 1052, 1059 (2d Cir. 1980), vacated on other grounds, 450 U.S. 903, (1981); Hull v. Celanese Corp., 513 F.2d 568, 571 (2d Cir. 1975); Emle Industries, Inc. v. Patentex, Inc., 478 F.2d 562 570-71 (2d Cir. 1973); Med. Diagnostic Imaging, 542 F. Supp. 2d at 306.  In that situation, disqualification is appropriate if "(1) the moving party is a former client of the adverse party's counsel; (2) there is a substantial relationship between the subject matter of the counsel's prior representation of the moving party and the issues in the present lawsuit; and (3) the attorney whose

---

[3]  On April 1, 2009, while this motion was pending, the New York Rules of Professional Conduct (the "New York Rules") took effect, replacing the New York Code.  The Court refers to the New York Code because it applied at the time of the conduct at issue.  Neither side contends that application of the new rules would affect the outcome of this motion.

disqualification is sought had access to, or was likely to have had access to, the relevant privileged information in the course of his prior representation of the client." Evans, 715 F.2d at 791.

Outside of these two situations, courts "have shown considerable reluctance to disqualify attorneys despite misgivings about the attorney's conduct." Nyquist, 590 F.2d at 1246 (citing W.T. Grant Co., 531 F.2d 671; Ceramco, Inc. v. Lee Pharms., 510 F.2d 268 (2d Cir. 1975)).  That the representation may create an appearance of impropriety generally is insufficient for disqualification.  The Second Circuit has cautioned that the "appearance of impropriety is simply too slender a reed on which to rest a disqualification order except in the rarest cases." Nyquist, 590 F.2d at 1247; Armstrong, 625 F.2d 433, 446 (2d Cir. 1980) (stating that "there may be unusual situations where the 'appearance of impropriety' alone is sufficient to warrant disqualification").

In addition, "the Second Circuit requires a high standard of proof on the part of the party seeking to disqualify an opposing party's counsel." Kubin v. Miller, 801 F. Supp. 1101, 1113 (S.D.N.Y. 1992) (citing Cook Indus., 569 F.2d at 739); see also Evans, 715 F.2d at 791; Occidental Hotels Mgmt. B.V. v. Westbrook Allegro L.L.C., 440 F. Supp. 2d 303, 309

(S.D.N.Y. 2006); Paramount Commc'ns, Inc. v. Donaghy, 858 F. Supp. 391, 394 (S.D.N.Y. 1994).

## B. Analysis

At the outset, it should be noted that neither of the two recognized disqualification situations is present in this case. No concurrent representation of another client by plaintiff's counsel calls into question her loyalty to plaintiff. Soros is not a former client of plaintiff's counsel and was never in a position to have divulged privileged information to her.[4]

Nevertheless, disqualification may be appropriate if the misconduct alleged here taints this proceeding or creates an exceptional appearance of impropriety. Soros claims that

_____

[4] Soros cites Hull v. Celanese Corp., 513 F.2d 568 (2d Cir. 1975), for the proposition that "the Second Circuit has acknowledged that there are other circumstances [outside the two recognized situations] when disqualification is appropriate." (Soros Reply at 1.) Hull was a "novel" case where the plaintiff's law firm sought to join as a new plaintiff a former member of defendant's corporate legal staff, who "had been active in the defense of this very action." 513 F.2d at 569. The Second Circuit noted that the case presented a "divergence from the more usual situation of the lawyer switching sides to represent an interest adverse to his initial representation." Id. at 569. The court likened the case's "unusual fact pattern" to the situation where an attorney himself switches sides because the plaintiff's law firm was in a position to use privileged information known to its new client against the defendant. See id at 572. In affirming the disqualification order, the Court of Appeals concluded that "the scope of this opinion must, of necessity, be confined to the facts presented and not read as a broad-brush approach to disqualification." Id. Contrary to defendant's suggestion, Hull is not a watershed to a more freewheeling disqualification analysis.

Grayson has violated the Protective Order and the Settlement Agreement through disclosures she allegedly made (1) in connection with her retention by TradeWinds; (2) in the original and amended complaints in this action; and (3) in TradeWinds's applications to the bankruptcy court to approve her retention. In addition, he alleges (4) certain prospective violations of these agreements that would occur if she continued to represent plaintiff in this action.

(1)  <u>Disclosures in Connection with Retention</u>

Grayson learned about the existence of the North Carolina action during discovery in <u>Jet Star II</u>. Approximately two years later, TradeWinds retained her to try to pierce C-S Aviation's corporate veil and hold Soros and Chatterjee liable for the North Carolina default judgment. According to Soros, "[a] reasonable inference to be drawn" from these facts "is that Grayson directly or indirectly disclosed to TradeWinds information she was obligated . . . to maintain in confidence and not to disclose and not to use" outside of <u>Jet Star II</u>. (Soros Mem. at 8.)

Soros cannot satisfy his high standard of proof merely by drawing a "reasonable inference" of misconduct, or with vague speculation about prohibited disclosures. In a sworn declaration, Grayson affirms that she did not disclose any

Confidential Litigation Materials to TradeWinds or Tuggle Duggins. She also swears that lawyers from Tuggle Duggins approached her and already were aware of the veil-piercing claim asserted in Jet Star II and the fact that she had served as plaintiff's counsel, information that was a matter of public record. Soros presents no evidence to counter this plausible account.

In his reply brief, Soros complains that Grayson has failed to produce affidavits from anyone at TradeWinds or Tuggle Duggins to corroborate her self-serving account. At oral argument, Grayson represented that she could produce such affidavits. (Oral Arg. Tr. at 16.) This representation is sufficient. The affidavits would prompt a demand for depositions or a hearing, effectively "transform[ing this Court] 'into the grievance committee of the Bar Association, which is certainly not [its] function.'" In re Osage Exploration Co., 104 F.R.D. 45, 48-49 (S.D.N.Y. 1984) (quoting Lefrak v. Arabian American Oil Co., 527 F.2d 1136, 1141 (2d Cir. 1975)). Soros has failed to establish any prohibited disclosures in connection with Grayson's retention in this case.

(2) Disclosures in the Original and Amended Complaints

Soros argues that the complaints filed in this case (a) use Litigation Materials in violation of the Protective

Order and (b) disclose the nature and bases of the Jet Star II veil-piercing claim in violation of the Settlement Agreement.

(a) Use of Litigation Materials

The Protective Order provides that "All Litigation Materials shall be used by the parties solely for the prosecution and defense of [Jet Star II], and not for any other purpose." Soros does not dispute Grayson's claim that she relied exclusively on public court filings from Jet Star II— the summary judgment motion papers and, especially, Judge Baer's detailed opinion resolving that motion—to draft all papers she has filed in this action. Rather, Soros claimed in his opening brief that "[t]here is no provision in any of the applicable agreements and orders that permits Grayson to disclose or use information if the information is contained in a court file or is otherwise a matter of public record." (Soros Mem. 23.) In his reply brief, he qualifies this assertion by conceding that, "Clearly, if information . . . became public through no fault of Grayson, such proscriptions [on its use] would not apply." (Soros Reply Mem. at 8 n.3.) Nevertheless, he asserts that "it was Grayson who made public much of the information she used in preparing the complaint in this action" by failing to file her summary judgment opposition papers under seal. (Id. at 8; Soros 2nd Aff. Ex. P.)

- 15 -

In fact, most of the information contained in the original and amended complaints in this action can be found in the _Jet Star II_ Opinion.  Because that information became public through no fault of Grayson, the Protective Order does not restrict her from using it.  Soros has not parsed the complaints to identify shreds of information not derived from the _Jet Star II_ Opinion, nor will the Court.  In addition, Soros himself filed his motion papers in _Jet Star II_ publicly, attaching volumes of Litigation Materials stamped as "confidential."  He did not object when Grayson likewise failed to file the opposition papers under seal.  Soros has not established any prohibited use of Litigation Materials in the original or amended complaints.

(b) Disclosure of the Veil-Piercing Claim

In the Settlement Agreement, Grayson promised to keep confidential "the existence, provisions and substance of [the] Agreement, and the claims for relief sought against Mr. Soros . . . and the bases or asserted bases therefore."  The original and amended complaints she filed in this case recite the fact that "Jet Star Enterprises brought suit in the Southern District seeking to, _inter alia_, pierce the corporate veil of C-S [Aviation] to reach defendants Soros and Chatterjee."  This disclosure plainly violates her confidentiality obligations under the Settlement Agreement.  In addition, because the veil-

piercing  claim  here  is  premised  upon  the  same  factual
allegations at issue in <u>Jet Star II</u>, the complaint discloses the
"bases  or  the  asserted  bases"  of  the  <u>Jet Star II</u>  claim,  in
violation of the Settlement Agreement.

 Even  so,  Soros  does  not  explain  how  the  improper
disclosures  in  the  complaints  affect  or  taint  this  case.   The
Second  Circuit  has  stated  that  "the  institution  of  suit  .  .  .
does  not  constitute  the  kind  of  prejudice  to  an  adversary  from
which  this  court  can  or  should  give  relief."  <u>Ceramco</u>,  510  F.2d
at  271  (holding  that  attorney's  improper  phone  call  to  adversary
to  obtain  information  about  proper  venue  for  suit  did  not
warrant  disqualification);  <u>Fisher  Studio  v.  Loew's  Inc.</u>,  232
F.2d  199,  204  (2d  Cir.  1956)  (holding  that  improper  solicitation
was  not  a  ground  for  disqualification).   Presumably,  had  Grayson
declined  to  file  the  veil-piercing  claim  on  TradeWinds's  behalf,
another  attorney  would  have  filed  it,  and  the  case  would  proceed
just  the  same.   Therefore,  her  disclosures  of  the  <u>Jet Star II</u>
claim  in  the  original  and  amended  complaints  do  not  present
grounds for disqualification.

 (3)  <u>Disclosures in the Bankruptcy Applications</u>

 In  support  of  TradeWinds's  applications  to  the
bankruptcy  court,  Grayson  submitted  a  declaration  disclosing
that  she  had  "prior  unique  experience  with  litigation  in  the
[Southern  District  of  New  York]  to  pierce  the  [c]orporate  veil

of C-S [Aviation] to reach its principals." This reference to Jet Star II appears to violate her obligation under the Settlement Agreement to keep the claim asserted in that case confidential. For the same reasons above, however, this violation does not taint this action or warrant disqualification.

(4) <u>Prospective Violations</u>

Soros's main argument is that prospective violations by Grayson "will taint this action and subvert the integrity of the judicial process in an increasingly material way the longer she is permitted to serve as [plaintiff's] counsel." (Soros Mem. at 14.) Specifically, he asserts that she will use confidential information (a) originally produced in Jet Star II subject to the Protective Order and (b) about the Jet Star II settlement.

(a) Re-discovery of Information

Soros does not dispute Grayson's claim that she destroyed all Litigation Materials except for deposition transcripts, attorney work product, and papers filed with the court, in compliance with the Protective Order. Rather, he claims that she "is unable to eliminate from her mind and to refrain from using in this action the information she learned from Litigation Materials and Confidential Litigation Materials she obtained in prior actions." (Soros Mem. at 14.)

Essentially, he objects to her re-using Litigation Materials that he will have to produce again in this case.

At least one court has rejected such a "strained reading of the word 'use' in [a] protective order" because it would "turn[] any protective order barring future use of confidential information that is independently relevant and discoverable in a subsequent action into a restriction on an attorney's right to practice law." Hu-Friedy Mfg. Co., Inc. v. Gen. Elec. Co., No. 99 Civ. 0762, 1999 WL 528545, at *2 (N.D. Ill. July 19, 1999). The Protective Order does not restrict its signatories from engaging in future litigation that would involve overlapping discovery. The case Soros cites, In re Peters, 543 F. Supp. 2d 326, 334-35 (S.D.N.Y. 2008), does not support such an interpretation. There, the attorney violated a protective order by taking deposition transcripts from one case and filing them as an exhibit in another. Id. The information was not independently produced in the other case.

Even assuming that Grayson's re-discovery of information originally produced in Jet Star II would violate the Protective Order, such a violation would not warrant her disqualification from this case. Soros argues in his brief that her prior access to confidential information disclosed under the Protective Order necessarily gives TradeWinds an unfair advantage and taints this case. He compares the situation to

that where an attorney is in a position to use privileged information against a former client in litigation related to the prior representation. This analogy is inapt because privileged information is not subject to discovery. An attorney's prior access to relevant but non-discoverable information gives her an unfair advantage in litigation against a former client. By contrast, any attorney representing plaintiff in this case would have access to the information at issue through discovery. See Hu-Friedy Mfg., 1999 WL 528545, at *2 (concluding that plaintiff's counsel "has no unfair advantage in this action due to [her] previous exposure to the confidential information" because "the information [defendant] seeks to prevent [plaintiff's counsel] from using is relevant to this case, and any reasonably competent attorney would routinely obtain it in discovery"); see also Med. Diagnostic Imaging, 542 F. Supp. 2d at 315 (concluding that "only access to client communications . . . threatens the integrity of the current litigation [and] warrants disqualification"; disqualification is not warranted "[i]f a party is capable of securing confidential information by means other than through prior representation"); DeVittorio v. Hall, No. 07 Civ. 0812 (WCC), 2007 WL 4372872, at *10 (S.D.N.Y. Dec. 12, 2007) (finding that counsel's exposure to adversary's information, obtained during prior attorney-client relationship, did not create unfair advantage warranting

disqualification, in part because "to the extent that information is relevant in the present action it would presumably be discoverable"); Gen. Am. Commc'ns Corps. v. Rumpf, No. 83 Civ. 2308, 1989 WL 101926, at *4 (S.D.N.Y. Aug. 29, 1989) (declining to disqualify where information shared with attorney "was not necessarily the sort of information that would have been undiscoverable during discovery or even during depositions").

At oral argument, Soros clarified that the real unfair advantage is the "head start" that Grayson's prior access gives plaintiff in this case. (Oral Arg. Tr. at 9.)   However, the court filings in Jet Star II are a treasure trove of information concerning Soros's alleged alter ego relationship with C-S Aviation.   They would give any attorney for plaintiff a substantial and perfectly appropriate head start in this case. Grayson's reliance on public information available to anyone else creates no unfair advantage.   Soros points to no evidence produced in Jet Star II that remains secret and could be used by Grayson to the unfair benefit of plaintiff.   "The bare assertion that [plaintiff's attorney] has a tactical advantage in the litigation of the suit based on the knowledge gained in the prior suit is unconvincing." First Impressions Design & Mgmt., Inc. v. All That Style Interiors, Inc., 122 F. Supp. 2d 1352, 1354 (S.D. Fla. 2000).   "While disqualification is clearly

punitive insofar as [plaintiff] and its . . . counsel are concerned, its benefit to [defendant] is indeed questionable". W.T. Grant Co., 531 F.2d at 677 (refusing to disqualify plaintiff's law firm after it improperly interviewed defendant without counsel, because the law firm was "already independently in possession of documentary evidence which provided . . . the basis for the complaint" and "the transcript of [plaintiff's] interview [has become] a public record").

The cases relied upon by Soros do not support his argument that an attorney's prior access to public or discoverable information creates an unfair advantage. In two of the cases, disqualification was premised on an employee of a party switching sides and taking with him privileged and/or non-discoverable confidential information. See Hull v. Celanese Corp., 513 F.2d 568 (2d Cir. 1975) (attorney disqualified for seeking to join as new plaintiff a former member of defendant's corporate legal staff, who "had been active in the defense of this very action"); Cargill Inc. v. Budine, No. CV-F-07-349, 2007 WL 1813762, at *11 (E.D. Cal. June 22, 2007) (attorney disqualified for hiring defendant's former executive, who had "participated in privileged communications" and had "access to confidential information not normally available to them through normal discovery means"). In the other two, disqualification was based upon the appearance of impropriety alone, with no

finding of taint. Rentclub, Inc. v. Transamerica Rental Fin. Corp., 811 F. Supp. 651, 655 (M.D. Fla. 1992), aff'd, 43 F.2d 1439 (11th Cir. 1995); Butler v. Biocore, 348 F.3d 1163 (10th Cir. 2003). The mere appearance of impropriety presents grounds for disqualification in this circuit only "in the rarest of cases." Nyquist, 590 F.2d at 1247; see also European Cmty. v. RJR Nabisco, Inc., 134 F. Supp. 2d 297, 304 n.7 (E.D.N.Y. 2001) (noting that "the disqualification standard adopted by the Second Circuit stands in pronounced contrast to the standard adopted in certain other jurisdictions"). Grayson's re-discovery of information originally produced in Jet Star II, in arguable violation of the Protective Order, does not present one of those cases.

Soros protests that "violations of discovery protective orders undermine the free flow of information in discovery and engender discovery disputes." (Soros Reply Mem. at 2.) Yet he acknowledges that the grievance committee of this Court routinely handles such matters. See, e.g., In re Peters, 543 F. Supp. 2d at 334-35 (imposing interim suspension on attorney for, inter alia, violation of a protective order). "[A] federal court should not disqualify an attorney on ethical grounds from representing a party in a pending lawsuit in the absence of a reasonable basis for believing that his or her unprofessional conduct may affect the outcome. . . . Otherwise

conventional   disciplinary   machinery   should   be   used."
Nyquist, 590 F.2d at 1248 (Mansfield, J., concurring).

          (b) Use of Settlement Information

          The Settlement Agreement requires that its "existence,
provisions and substance" be kept confidential and prohibits the
disclosure of this information "to any person or entity for any
purpose."   The   agreement   does   not   restrict   Grayson   from
representing other clients against Soros in future cases arising
from the same facts at issue in Jet Star II.  Relying on Bassman
v. Fleet Bank, 279 A.D. 2d 280 (N.Y. App. Div. 2001), Soros
urges that such a restriction be read into the agreement.   The
argument   is   that   Grayson   necessarily   would   use   confidential
information about the Jet Star II settlement in this action, and
that such use is equivalent to disclosing the information to her
new   client.   The   Court   declines   to   interpret   a   standard
confidentiality provision as an implied restriction on counsel's
ability   to   represent   other   clients,   especially   as   such   a
restrictive covenant would itself violate ethical rules.[5]   There

---

[5] See N.Y. Disciplinary Rule 2-108(B) ("In connection with the
settlement of a controversy or suit, a lawyer shall not enter into an
agreement that restricts the right of a lawyer to practice law."); N.Y
State Bar Assoc. Ethics Opinion No. 00-730 (July 27, 2000) (stating
that "confidentiality provisions that . . . prohibit the parties and
their lawyers from disclosing the terms of a settlement are common and
do not violate DR-2-108(B)" but would violate the rule "if their
practical effect is to restrict the lawyer from undertaking future
representations"); ABA Model Rule 5.6(b) ("A lawyer shall not
participate in offering or making an agreement in which a restriction
on the lawyer's right to practice is part of the settlement of a

is no reason why Grayson cannot represent TradeWinds without disclosing the terms of the Jet Star II settlement.

But even assuming that Grayson were to breach her confidentiality obligations, the remedy specified in the Settlement Agreement is disgorgement of the settlement funds she received, not disqualification. Soros's contention that disqualification should follow rests in large part on an overbroad reading of Blue Cross and Blue Shield of New Jersey v. Philip Morris, Inc., 53 F. Supp. 2d 338, 342 (E.D.N.Y. 1999) (Weinstein, J.). In that case, the defendant Phillip Morris consented to an agreement disqualifying its counsel from the action. Id. at 344. Essential to the court's enforcement of the disqualification agreement was the fact that it "resembled a

controversy between private parties."); ABA Formal Opinion No. 00-417 (stating that "Rule 5.6(b) does not proscribe a lawyer from agreeing not to reveal information about the facts of the particular matter or the terms of its settlement," but does proscribe prohibitions on the attorney's future use of information learned during the settled case); Hu-Friedy Mfg., 1999 WL 528545, at *2 (refusing to interpret agreement as restriction on future use of information because that would be "contrary to the policy of Rule 5.6(b)"); see also Stephen Gillers & Richard W. Painter, Free the Lawyers, A Proposal to Permit No Sue Promises in Settlement Agreements, 18 Geo. J. Legal Ethics 291, 305 (2005) ("If courts interpret a confidentiality agreement as the Bassman court did, the practical effect could be to vitiate the prohibition in [Rule] 5.6(b) . . . ."). Soros cites Feldman v. Minars, 230 A.D. 2d 356, 360-61 (N.Y App. Div. 1997), which held that an attorney's agreement not to "assist or cooperate" with other parties in similar litigation against the settling defendants was enforceable, even though "there [was] no question that a strong case can be made [that] such a provision constitutes an impermissible restraint on the law firm's practice of law in violation of . . . DR 2-108 (B)." But Grayson did not promise that she would not assist or cooperate with other parties in future litigation against Soros, only that she would keep the terms of the prior settlement confidential.

stipulation between parties of the type routinely enforced by the courts in the interests of efficient judicial administration." Id.   TradeWinds has not stipulated to any restriction on its right to be represented by its chosen counsel.   The Blue Cross court went on to find that the case—a "mass tort indirectly involving the welfare of millions of Blue Cross insureds"— presented "one of those rare case" requiring disqualification on the basis of the appearance of impropriety alone. See id. at 346–347 (contemplating the public outrage if the law firm that formerly represented Blue Cross were permitted to "switch sides [and] represent[] the tobacco companies").   By contrast, Grayson's violation of her confidentiality obligations to Soros would not create an extraordinary appearance of impropriety.

Soros also cites a couple of New York state cases disqualifying counsel for violating a restrictive covenant contained in a settlement agreement from a prior case. See Feldman, 230 A.D. 2d 356; Bassman, 279 A.D. 2d 280.   These decisions do not purport to follow the federal standards for disqualification that control here.   "A federal court's decision of whether to disqualify counsel 'must ultimately be guided by the goal of a trial process that lacks any hint of a taint.'" Occidental Hotels Mgmt. B.V. v. Westbrook Allegro L.L.C., 440 F. Supp. 2d 303, 309 (S.D.N.Y. 2006) (quoting Skidmore v. Warburg

Dillon Read LLC, No. 99 Civ. 10525 (NRB), 2001 WL 504876, at *2

(S.D.N.Y. May 11, 2001)).

## IV.   CONCLUSION

For the reasons above, the disqualification motion is

denied.   This action remains stayed until C-S Aviation's motion

to vacate the default judgment is resolved in North Carolina

state court.

**SO ORDERED.**

**Dated:   New York, New York**
**        May 12, 2009**

                                      JOHN F. KEENAN
                                 United States District Judge

- 27 -