USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: Mar. 31, 2015

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------X

TRADEWINDS AIRLINES, INC.,  :
                                       :
              Plaintiff,  :
                                         :
    -against-  :
                                         :
GEORGE SOROS and PURNENDU  :
CHATTERJEE,  :
                                       :  No. 08 Civ. 5901 (JFK)
             Defendants.  :  No. 10 Civ. 8175 (JFK)

----------------------------------X

COREOLIS HOLDINGS, INC. and  :    **Opinion and Order**
TRADEWINDS HOLDINGS, INC.,  :
                                         :
              Plaintiffs,  :
                                         :
    -against-  :
                                         :
GEORGE SOROS and PURNENDU  :
CHATTERJEE,  :
                                       :
             Defendants.  :

----------------------------------X

APPEARANCES

For Plaintiff TradeWinds Airlines, Inc.:
    SUSMAN GODFREY LLP
      By:  William Christopher Carmody
           Shawn J. Rabin
           Cory Buland
           Megan O'Hara Easley

For Plaintiffs Coreolis Holdings, Inc.
and TradeWinds Holdings, Inc.:
    RESSLER & RESSLER
      By:  Ellen R. Werther
           Bruce J. Ressler

For Defendant George Soros:
    BUTLER, FITZGERALD, FIVESON & McCARTHY, P.C.
      By:  Raymond Fitzgerald
           David J. McCarthy

```
WILLKIE FARR & GALLAGHER LLP
By:  Martin B. Klotz
     Alison R. Levine

For Defendant Purnendu Chatterjee:
     MORRISON COHEN LLP
     By:  Kristin T. Roy

     POSTERNAK BLANKSTEIN & LUND LLP
     By:  Dustin F. Hecker
          James Kruzer
```

**JOHN F. KEENAN, United States District Judge:**

Plaintiffs TradeWinds Airlines, Inc. ("TradeWinds Airlines"), Coreolis Holdings, Inc. ("Coreolis"), and TradeWinds Holdings, Inc. ("TradeWinds Holdings") hold an unsatisfied North Carolina default judgment against C-S Aviation Services, Inc. ("C-S Aviation").  Plaintiffs brought the instant actions to pierce the corporate veil of C-S Aviation and recover from the company's alleged alter egos, Defendants George Soros and Purnendu Chatterjee.

Before the Court are three motions.  The first is Defendants' motion for summary judgment on Plaintiffs' veil-piercing claims.  Defendants also move to strike a portion of expert testimony pertaining to the capitalization of C-S Aviation offered by Martin J. Bienenstock.  Plaintiffs move to strike portions of Guhan Subramanian's expert report.  For the reasons that follow, Defendants motion for summary judgment is granted.  The motions concerning the expert reports are denied as moot.

## I. Background

## A. Facts

Soros and Chatterjee have had a business relationship stretching back to the 1980s. (SF ¶ 13.)[1] They each created a firm to provide advisory services for investment funds: Soros formed Soros Fund Management ("SFM"); (SF ¶¶ 5–6.) and Chatterjee formed Chatterjee Management Company ("CMC"). (SF ¶¶ 11–12, 217–18.) SFM earned management fees from the investment activities of the entities it advised. (SF ¶ 14.) In the 1980s and early 1990s, Chatterjee would bring investment ideas to SFM, and SFM and CMC would manage the investments. (SF ¶ 13.) Soros shared fees earned from the investment activity managed by SFM and CMC with Chatterjee. (SF ¶ 15.)

In the early 1990s, Chatterjee shared his idea for an aircraft leasing business with Soros, and the two men started one. (SF ¶ 20.) In addition to other possible unknown contributors, Quantum Industrial Partners, LDC ("QIP"), a fund advised by SFM, invested, as did three funds collectively known as the Winston Funds that CMC advised. (SF ¶¶ 21–22, 24, 28, 216.) S-C Aviation Investments, Inc., ("S-C Aviation") a corporation owned by Soros, also invested. (SF ¶¶ 21, 31, 215.)

---

[1] "SF" refers to the parties' Rule 56.1 Statement of Material Facts, as fully set forth in Defendants' Reply to Plaintiffs' Response. (ECF No. 232.)

Collectively, QIP, the Winston Funds, and S-C Aviation will be referred to as "the Investors."

While his ownership interest varied over time, Soros owned approximately 0.2 percent of QIP from 1994 until 1999, and approximately 15 percent from 2000 through 2003. (SF ¶¶ 25-26, 215.) The parties dispute the ownership interests of QIP, the Winston Funds, and S-C Aviation in the aircraft leasing business. Defendants assert that each owned approximately one-third of the aircraft leasing business. (SF ¶¶ 27, 30, 32.) Plaintiffs contend, based on Soros's recollection during his deposition, that QIP's ownership interest was approximately 50 percent, while the Winston Funds and S-C Aviation each owned 25 percent. (SF ¶¶ 27, 30, 32, 219.) The parties also contest whether Chatterjee or other investors in the Winston Funds contributed the majority of the capital for the aircraft leasing business. (SF ¶¶ 29, 219.) In addition to the contributions from the Investors, funding was also obtained through a series of loans from financial institutions. (SF ¶ 49.)

In order to understand the ultimate decision reached here, it will be necessary for the Court to recite the complicated corporate and financial structure and occurrences that C-S Aviation was involved in over the years. The structure of the aircraft leasing business changed over time, but in general it took the following form. Special purpose trusts held legal

title to each aircraft, and some trusts held title to multiple aircraft. (SF ¶ 34.) First Security Bank, N.A., which later became known as Wells Fargo Bank, Northwest, N.A. ("Wells Fargo"), was the original trustee of the special purpose trusts. (SF ¶¶ 35, 230.)

The beneficiary of each special purpose trust was a separate special purpose vehicle ("SPV") — organized either under Delaware law as a limited liability company or Cayman Islands law as a limited duration company — that was the beneficial owner of one and sometimes multiple aircraft. (SF ¶¶ 37, 223.) S-C Aircraft Holdings LLC ("S-C Holdings") and P-G Aircraft Holdings LLC ("P-G Holdings") owned the SPVs either directly or through their respective wholly-owned subsidiaries S-C Newco LLC ("S-C Newco") and P-G Newco LLC ("P-G Newco"). (SF ¶ 39.) P-G Holdings, S-C Holdings, P-G Newco, and S-C Newco are collectively referred to as the "Holding Companies." The Investors owned S-C Holdings and P-G Holdings either directly or through affiliates. (SF ¶ 40.) None of the SPVs or Holding Companies had their own employees. (SP ¶¶ 45, 222.) Loans procured by S-C Holdings, P-G Holdings from financial institutions others, as well as contributions from the Investors and others, helped fund the aircraft leasing business. (SP ¶ 49.)

In 1994, C-S Aviation was incorporated under Delaware law. (SF ¶ 59.)  C-S Aviation provided management services for the aircraft leasing business, including finding aircraft to purchase and buyers and lessees for the aircraft, and arranging for maintenance and storage of the aircraft. (SF ¶ 62; Easley Decl. Ex 14 ¶ 8.)  C-S Aviation entered into Management Agreements with at least some of the SPVs, although Plaintiffs contend that it is unclear whether it was with all of the SPVs. (SF ¶ 63; Klotz Decl. Ex. 48.)  Under the original Management Agreements, C-S Aviation received fees for its services to the SPVs based on aircraft purchase prices, rental income, and financing. (SF ¶¶ 103, 315–16.)

Soros was never a shareholder, director, or officer of C-S Aviation. (SF ¶ 258.)  Chatterjee was a director and sole shareholder of C-S Aviation at least until July 2003. (SF ¶¶ 60, 246, 251.)  Although C-S Aviation's certificate of incorporation authorized the company to issue one thousand shares with a par value of one dollar per share, Chatterjee paid $100 for $1,000 worth of stock. (SF ¶¶ 245, 247.)  C-S Aviation had directors and officers, but the parties dispute whether they functioned as such. (SF ¶ 69.)  C-S Aviation managed a fleet that ranged from 22 to 60 aircraft. (SF ¶ 67.)  It had a peak of 22 employees in 1999 and eight employees in July 2003. (SF ¶ 68.)

Soros, Chatterjee, and others involved in the aircraft leasing business also used the name "C-S Aviation" to refer to the aircraft leasing business in general. (SF ¶¶ 263-64, 281-82, 295-96.) Indeed, Soros was not aware that C-S Aviation was also a separate and distinct management company until after it ceased operations. (SF ¶ 269.)

C-S Aviation also had accountants that prepared financial statements for at least some periods, although the parties dispute how regularly this was done. (SF ¶¶ 70, 72-73.) The accountants also maintained separate bank accounts and accounting records for some of the SPVs and Holding Companies. (SF ¶¶ 75-76.) The accountants paid expenses of the SPVs and Holding Companies out of their respective accounts, but sometimes they borrowed from other SPVs, Holding Companies, or C-S Aviation to pay those expenses. (SF ¶¶ 77, 79, 334, 350-51.) "Due to" and "due from" entries appear on C-S Aviation's general ledger, marking at least some of the times when C-S Aviation advanced funds to pay the expenses of an SPV. (SF ¶ 80.) Similarly, C-S would mark "due to" and "due from" entries on the relevant SPVs' or Holding Companies' general ledgers at a least some of the times that an SPV or Holding Company borrowed from another SPV or Holding Company. (SF ¶ 80)

C-S Aviation lost money in all but two of the years it was in operation and had "substantial negative equity" of roughly $1

million to $2.5 million, for the period from 1995 to July 2003.
(SF ¶¶ 104-06, 306)  Chatterjee and his affiliated companies
loaned substantial funds to C-S Aviation, although the amount he
loaned and the amount that he was paid back are contested. (SF
¶¶ 107-09, 307-08.)

In 1995, Soros and Chatterjee entered into what has been
called the "First Side Letter." (SF ¶¶ 16, 253; Klotz Decl. Ex.
21.)  Pursuant to the First Side Letter, Soros and his
affiliates would pay CMC half of any fees that Soros or an
affiliate like SFM received on identified investments. (SF
¶ 17.)  Soros and his affiliates were entitled to a set-off of
50 percent of the fees Chatterjee and his affiliates earned
directly on the investments. (SF ¶ 18.)

In October 1996, Soros organized Soros Fund Management LLC
("SFM LLC") in Delaware.  (SF ¶ 7.)  On January 1, 1997, Soros
then assigned the rights and obligations of SFM to SFM LLC in
the Master Contribution, Assignment and Assumption. (SF ¶ 8;
Klotz Decl. Ex. 16.)  Soros served as the chairman of SFM LLC
from January 1, 1998 through December 31, 2004. (SF ¶ 9.)  SFM
LLC was an investment advisor for Quantum Industrial Holdings,
Ltd. ("QIH"). (SF ¶ 10.)  QIP, one of the Investors, is a
consolidated subsidiary of QIH. (SF ¶ 22.)  SFM and then SFM
LLC, along with other outside advisors, advised investment
programs conducted by QIH and QIP. (SF ¶ 24.)

Five of the SPVs' aircraft, referred to as "Five MD-82s," were subject to a 1997 Securitization Agreement, under which they were leased to TransWorld Airlines ("TWA"). (SF ¶ 130.) C-S Aviation managed the Five MD-82s pursuant to five servicing agreements with the trusts holding legal title to the aircraft. (SF ¶ 131.) Under the Securitization Agreement, there were four tranches of debt (A, B, C, and D) issued by each of the Five MD-82 owners. (SF ¶ 133.) QIP was a Tranche D certificate holder. (Id.) The parties dispute whether Soros and the Winston Funds guaranteed QIP for their portion of losses resulting from QIP's exposure to Tranche D. (SF ¶ 243.)

In December 1998, Soros and Chatterjee entered into the "Restructuring Agreement." (SF ¶¶ 142, 259; Klotz Decl. Ex. 70.) The Restructuring Agreement transferred control of the management and conduct of the business of certain Chatterjee entities to Soros or his agent or designee. (SF ¶ 265.) As discussed in greater detail later, the parties disagree about whether Chatterjee, through the Restructuring Agreement, transferred control of C-S Aviation to SFM LLC or to Soros personally together with his agents. (SF ¶¶ 143, 260–61.) Neither Chatterjee nor CMC participated in C-S Aviation's management decisions after late 1998 or 1999. (SF ¶¶ 274–75.)

In 1999, SFM LLC, on behalf of the Investors, wanted to sell the aircraft leasing business and C-S Aviation as a going

concern. (SF ¶¶ 146, 260–61, 284.)  C-S Aviation engaged Morgan Stanley to sell the aircraft leasing business and C-S Aviation in March 1999, but the sale failed and SFM LLC decided to attempt to wind down the aircraft leasing business by selling off the aircraft piecemeal over time. (SF ¶¶ 147–48.)

On September 24, 1999, S-C Newco and P-G Newco — the subsidiaries of S-C Holdings and P-G Holdings — entered into a credit agreement (the "Credit Agreement") with a group of lenders (the "Lenders") represented by Bankers Trust Company Americas ("Bankers Trust") as Administrative Agent and Morgan Stanley Senior Funding, Inc. as Syndication Agent. (SF ¶ 50; Klotz Decl. Ex. 38.)  After Deutsche Bank Trust Company ("Deutsche Bank") acquired Bankers Trust, Deutsche Bank became the Administrative Agent for the Lenders. (SF ¶ 51.)  S-C Newco and P-G Newco borrowed approximately $210 million under the Credit Agreement. (SF ¶ 52.)

In connection with the Credit Agreement, S-C Holdings and P-G Holdings transferred their interests in 23 SPVs, which each owned an aircraft, to S-C Newco and P-G Newco, respectively. (SF ¶ 53.)  The loan under the Credit Agreement was secured by S-C Holdings and P-G Holdings pledging 100 percent of their respective equity interests in S-C Newco and P-G Newco as the Collateral. (SF ¶ 55.)  Additional security took the form of mortgages on the pledged aircraft; a security interest in S-C

Newco's and P-G Newco's equity interest in each of the SPVs that owned a mortgaged aircraft; and a security interest in certain bank accounts at Deutsche Bank, including accounts where aircraft lease proceeds were deposited (the "Collateral Accounts"). (SF ¶ 56.) The Credit Agreement also purports to allow the Lenders to terminate the Management Agreements between the SPVs and C-S Aviation in the event of a default, although Plaintiffs point to language in the Management Agreements that requires 60 days' written notice before termination. (SF ¶ 57; Klotz Decl. Ex. ¶ 48.)

In 2000, the Management Agreements were amended (the "Amended Management Agreements"). (SF ¶¶ 113, 322; Klotz Decl. Exs. 54–55.) The Amended Management Agreements established a new compensation structure whereby C-S Aviation would be reimbursed its operating expenses in discharging its duties under each respective amended management agreement. (SF ¶¶ 114, 322.)

After TWA went bankrupt in early 2001, C-S Aviation negotiated a deal whereby American Airlines agreed to purchase the Five MD-82s. (SF ¶ 134.) The sale proceeds from the American Airlines deal satisfied the first three tranches of debt, but were insufficient to repay Tranche D in full. (SF ¶ 135.) The parties dispute whether Chatterjee and others at C-S Aviation agreed to waive C-S Aviation's right to its sales fee

in relation to the sale of the Five MD-82s in order to reduce Tranche D's losses. (SF ¶¶ 136, 341-43, 348.)

In the immediate aftermath of the September 11th attacks, there was a global downturn in the aviation industry. (SF ¶ 168.) P-G Newco and S-C Newco defaulted on the Credit Agreement and entered into a Second Amendment to the Credit Agreement to cure the default in December 2001. (SF ¶ 238; Easly Decl. Ex. 64.) The Second Amendment to the Credit Agreement required, among other things, that Soros enter into a "Put and Call Agreement," which he did on December 18, 2001. (SF ¶¶ 239-40; Easly Decl. Ex. 65.) Under the Put and Call Agreement, Deutsche Bank could, under certain circumstances, "put" at least one aircraft to Soros and require him to purchase it. (SF ¶ 241) He could not be forced to purchase more than one aircraft before January 30, 2003. Although the put and call agreement contemplated a maximum of "two" put aircraft in certain circumstances, the parties dispute whether and when Soros was required to purchase a second "put" aircraft. QIP and the Winston Funds agreed to reimburse Soros for their pro rata share of payments made under the Put and Call Agreement. (SF ¶ 242.)

In 2002, P-G Newco and S-C Newco had trouble making their Credit Agreement loan payments. (SF ¶ 169.) Several times during 2002, they were only able to make quarterly loan payments because of additional capital contributions made by the

Investors to the aircraft leasing business. (SF ¶ 171.)  On
December 31, 2002, S-C Newco and P-G Newco did not make the
quarterly loan payment that was due. (SF ¶¶ 172, 356-57.)
During this time, SFM LLC made decisions concerning the priority
of payments that C-S Aviation would make. (SF ¶ 361.)

In January 2003, S-C Newco and P-G Newco were in default on
their obligations to Deutsche Bank under the Credit Agreement.
(SF ¶¶ 118, 174, 457.)  In January and February 2003, C-S
Aviation's operating Citibank account received $5 million in
cash from certain Deutsche Bank accounts of the SPVs and Holding
Companies. (SF ¶¶ 119, 366-72.)  Of that amount, $4 million was
then transferred to S-C Newco and P-G Newco accounts at Natexis
Bleichroeder, a bank. (SF ¶¶ 123, 373.)  C-S Aviation's board of
directors did not take action with regard to these transfers.
(SF ¶ 380.)

On January 30, 2003, TradeWinds sent a letter to C-S
Aviation discussing potential claims TradeWinds had against C-S
Aviation concerning tortuous interference, equipment
misrepresentation, and fraudulent inducement into a contract.
(SF ¶ 453.)  In that letter, TradeWinds asserted that potential
liability was in excess of $12.5 million. (Id.)

In February 2003, Deutsche Bank notified the Holding
Companies that they had defaulted and that all of their
obligations under the Credit Agreement were due immediately. (SF

¶ 175; Klotz Decl. Ex. 100.) That April, Deutsche Bank told the Holding Companies that it intended to exercise its right to dispose of the Collateral by public auction or sale. (SF ¶ 176.)

During the resulting negotiations concerning the default, Plaintiffs claim that Soros negotiated a discount of the purchase price of the Put and Call Agreement, but Defendants argue that Soros actually agreed to buy a second plane before he had to and negotiated at length for how many planes he would buy and how much they would cost. (SF ¶ 392.) In any event, Soros ultimately entered into the "Soros Letter Agreement" that resolved his personal liability under the Put and Call Agreement for $13,777,069.30. (SF ¶ 393; Klotz Decl. Ex. 58.) TradeWinds reasserted its claims against C-S Aviation in a fax sent June 5, 2003. (SF ¶ 454.)

On July 25, 2003, Deutsche Bank, the Holding Companies, and the subsidiaries of S-C Newco and P-G Newco entered into an "Acceptance Agreement." (SF ¶ 125; Klotz Decl. Ex. 58.) C-S Aviation was not a party to the Acceptance Agreement. (SF ¶ 405.) Pursuant to the Acceptance Agreement, all but $594,337.93 of the money in the Bleichroeder Accounts was transferred to Deutsche Bank. (SF ¶ 126.) The remaining $594,337.93 was transferred to an Akin Gump escrow account, where it went toward, inter alia, severance payments for C-S Aviation employees and Akin Gump legal fees. (SF ¶¶ 127, 395.)

Akin Gump represented Soros, C-S Aviation, the SPVs, and Holding Companies. (SF ¶ 383.) The escrow was funded using cash from the SPVs' accounts. (SF ¶ 396.)

The Acceptance Agreement also included provisions requiring (1) the obligors under the agreement to turn over the equity interests of S-C Newco and P-G Newco as partial satisfaction of $10,000 of the remaining balance of the Credit Agreement; (2) C-S Aviation's employees to resign or be terminated; and (3) termination of the Management Agreements. (SF ¶ 178.) Although C-S Aviation ceased operations on July 25, 2003, C-S Aviation was not formally wound down. (SF ¶¶ 179, 425, 439.)

Windshear Leasing, LLC took over management of the aircraft that C-S Aviation used to manage. (SF ¶¶ 180, 441.) Windshear was staffed primarily with former C-S Aviation employees and operated out of C-S Aviation's former offices at SFM LLC's New York headquarters, using C-S Aviation's old furniture and computer equipment valued at approximately $22,000. (SF ¶¶ 182, 443, 444.) After the C-S Aviation ceased operations, former employees sometimes conflated Windshear and C-S Aviation. (SF ¶ 449.)

## B. Procedural History

On November 14, 2003, Deutsche Bank sued TradeWinds Airlines and its former parent companies, TradeWinds Holdings and Coreolis, in North Carolina Superior Court. In February

2004, TradeWinds Airlines, TradeWinds Holdings, and Coreolis filed an amended third-party complaint against C-S Aviation, its parent companies, and Wells Fargo. The third-party complaint alleged that C-S Aviation, acting as the agent of the other third-party defendants, made false representations to induce TradeWinds Airlines, TradeWinds Holdings, and Coreolis to lease C-S Aviation aircraft. TradeWinds Airlines, TradeWinds Holdings, and Coreolis settled with Wells Fargo and C-S Aviation's parent companies. C-S Aviation failed to answer the North Carolina third-party complaint, and a default judgment was entered against it.

On June 30, 2008, three days after obtaining the $54.87 million default judgment against C-S Aviation in the North Carolina court, TradeWinds Airlines commenced this action to pierce the company's corporate veil and recover the judgment from Soros and Chatterjee. In 2010, TradeWinds Holdings and Coreolis commenced their veil-piercing action against Soros and Chatterjee, and the actions have since been litigated together. Plaintiffs allege that long-time business partners Soros and Chatterjee operated C-S Aviation as their alter ego by, inter alia, undercapitalizing it, ignoring corporate formalities, siphoning corporate funds, and, ultimately, stripping the company of its assets. According to Plaintiffs, these actions

rendered the company unable to satisfy the North Carolina default judgment.

On February 23, 2009, this Court stayed these proceedings pending the North Carolina trial and appellate courts' review of the default judgment. When the second group of plaintiffs filed their complaint in 2010, those proceedings were stayed as well.

Soros and Chatterjee successfully moved to have the North Carolina trial court set aside the default judgment; however, the court did not set aside the entry of default. After a six-day trial on the question of damages, the trial court entered final judgments in favor of Plaintiffs.

The North Carolina Court of Appeals unanimously affirmed the default judgment, <u>TradeWinds Airlines, Inc. v. C-S Aviation Servs.</u>, 733 S.E.2d 162 (N.C. Ct. App. 2012), and the North Carolina Supreme Court denied review, rendering the judgment final on June 12, 2013. <u>TradeWinds Airlines, Inc. v. C-S Aviation Servs.</u>, 743 S.E.2d 189 (N.C. 2013).

Defendants now move for summary judgment on the veil-piercing claims and to strike a portion of expert testimony pertaining to the capitalization of C-S Aviation. Plaintiffs move to strike expert testimony that they say provides legal opinions, opines on the ultimate legal question, and comments on Plaintiffs' state of mind.

## II. Discussion

## A. Legal Standard

"[S]ummary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law." Easterling v. Collecto, Inc., 692 F.3d 229, 233 (2d Cir. 2012) (internal quotation marks omitted). A fact is "material" if it could affect the outcome of the case under the governing substantive law. Spinelli v. City of N.Y., 579 F.3d 160, 166 (2d Cir. 2009). A dispute is "genuine" if there is evidence that could allow a "reasonable jury" to "return a verdict for the nonmoving party." McElwee v. Cnty. of Orange, 700 F.3d 635, 640 (2d Cir. 2012) (internal quotation marks omitted).

On summary judgment, the moving party can discharge its burden by pointing to the "absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). The nonmoving party must then show "specific facts" establishing a genuine triable issue. Wrobel v. Cnty. of Erie, 692 F.3d 22, 30 (2d Cir. 2012). Courts "must construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." Gary Friedrich Enters., LLC v. Marvel Characters, Inc., 716 F.3d 302, 312 (2d Cir. 2013). "Summary judgment is appropriate when the record taken as a whole could not lead a rational trier of fact to find

for the non-moving party." <u>Smith v. Cnty. of Suffolk</u>, 776 F.3d 114, 121 (2d Cir. 2015) (internal quotation marks omitted).

## B. Analysis

The Court notes at the outset that it has not considered Subramanian's challenged expert report in evaluating Defendant's motion for summary judgment. To give the Plaintiffs the benefit of all their potential evidence, the Court also assumes, for the purposes of this motion, that the Bienenstock expert report would be admissible.

The parties agree that Delaware law controls the analysis of the veil-piercing issue since C-S Aviation is a Delaware corporation. In order to pierce the corporate veil under Delaware law, Plaintiffs must show that (1) C-S Aviation and Soros or Chatterjee "operated as a single economic entity" and (2) "an overall element of injustice or unfairness is present." <u>Fletcher v. Atex, Inc.</u>, 68 F.3d 1451, 1457 (2d Cir. 1995) (alterations and internal quotation marks omitted).

Consistent with their burden on a summary judgment motion, Defendants point to a lack of evidence supporting either prong of the veil-piercing analysis. They also argue, in the alternative, that they cannot be held liable for the North Carolina default judgment without being afforded an opportunity to contest the underlying action on the merits.

As this Court has previously acknowledged, relevant considerations for whether Defendants and C-S Aviation operated as a "single economic entity" include

> whether the corporation was adequately capitalized for the corporate undertaking; whether the corporation was solvent; whether dividends were paid, corporate records kept, officers and directors functioned properly, and other corporate formalities were observed; whether the dominant shareholder siphoned corporate funds; and whether, in general, the corporation simply functioned as a façade for the dominant shareholder.

TradeWinds Airlines, Inc. v. Soros, Nos. 08 Civ. 5901, 10 Civ. 8175, 2012 WL 983575, at *6 (S.D.N.Y. Mar. 22, 2012) (quoting Fletcher, 68 F.3d at 1458). Some combination of these factors is required because none is alone sufficient to disregard the corporate form. See Wilson v. Thorn Energy, LLC, 787 F. Supp. 2d 286, 295 (S.D.N.Y. 2011). This analysis is used to determine whether there has been a "mingling of the operations of the entity and its owner." See NetJets Aviation, Inc. v. LHC Commc'ns, LLC, 537 F.3d 168, 176 (2d Cir. 2008).

Plaintiffs point to evidence that they claim establishes that C-S Aviation (1) was undercapitalized, (2) did not observe corporate formalities, (3) commingled funds, and (4) allowed Soros and Chatterjee to siphon cash from C-S Aviation to benefit themselves. In addition to the evidence they present here, Plaintiffs also reference a previous case where a veil-piercing claim concerning C-S Aviation, Soros, and Chatterjee survived summary judgment. See Jet Star Enters., Ltd. v. Soros, No. 05

Civ. 6585, 2006 WL 2270375 (S.D.N.Y. Aug. 9, 2006). There, the
following issues of fact precluded summary judgment:

> whether Soros and Chatterjee, through their agents at
> SFM:  1)failed to adequately capitalize CS Aviation;
> 2) commingled CS Aviation's assets with the assets of
> other entities that Soros and Chatterjee owned and/or
> controlled (i.e., the LLCs); 3) disregarded CS
> Aviation's formal management structure.

Id. at *7 (footnote omitted).

Before turning to the specific evidence that Plaintiffs set
forth and analyzing it in light of the relevant considerations,
the Court observes a broad problem with Plaintiffs' evidence
that makes summary judgment appropriate.  Consideration of the
evidence Plaintiffs set forth could not lead a rational trier of
fact to conclude that there was a "mingling of the operations"
of C-S Aviation and Soros and Chatterjee.  At most, the evidence
suggests that C-S Aviation may have been intertwined with SFM
LLC, the Holding Companies, the Investors, and the SPVs.  But
given Plaintiffs' theory of this case — that Soros and
Chatterjee are C-S Aviation's alter egos — Plaintiffs have
advanced no argument and offer no evidence that the corporate
forms of SFM LLC, the Holding Companies, the Investors, or the
SPVs should be disregarded.  Indeed, Plaintiffs specifically
argue that this is not a double-veil piercing case. (Pl. Mem.
19.)  The absence of evidence suggesting a "mingling of the
operations" of C-S Aviation and Soros and Chatterjee is fatal to
Plaintiffs' claims.

This problem arises from the fact that Chatterjee transferred control of C-S Aviation to SMF LLC in the Restructuring Agreement. See also Jet Star, 2006 WL 2270375, at *1 ("They agreed that control of CS Aviation would be transferred to Soros Funds Management LLC ("SFM")"); id. at * 6 ("Chatterjee and Soros executed a 'Restructuring Agreement' in 1999 whereby Chatterjee granted SFM 'control of his investment' in CS Aviation."). Plaintiffs maintain that control was handed over to Soros, but the plain terms of the agreement do not support such a reading. Exhibit 3 to the Restructuring Agreement states: "P. C. [Chatterjee] agrees to grant SFM control of his investment in C-S Aviation including the possible sale of C-S Aviation." (Klotz Decl. Ex. 70.) The Restructuring Agreement incorporates Exhibit 3 in two subsections of section 4. Section 4(a) refers to "the amounts owed under the various loan agreements and/or instruments listed on Exhibit 3 hereto in accordance with the payment terms and dates set forth in Exhibit 3 hereto." Similarly, section 4(d) mentions "any obligations . . . existing under the loan agreements and other instruments set forth on Exhibit 3 hereto." (Id.)

Plaintiffs' attempt to characterize Exhibit 3 as only a term sheet that was not incorporated into the agreement is unpersuasive and not supported by the deposition testimony they cite. While Soros testified that it was "meant to be a term

sheet which was then converted into a final agreement" and agreed that the "final Restructuring Agreement is what's controlling," that was in context of a question whether "without the Restructuring Agreement that followed, [the term sheet] would constitute the final [Restructuring Agreement]." (Easly Decl. Ex. 11 at 102.) Of course Exhibit 3 would not stand on its own without the Restructuring Agreement, but the Restructuring Agreement was finalized and it incorporated Exhibit 3.

Plaintiffs' argument concerning section 1(a) and Exhibit 2 of the Restructuring Agreement cannot overcome Exhibit 3's plain terms. Section 1(a) provides "Soros shall be vested with the complete control of the management and conduct of the business of the Entities [listed on Exhibit 2]." Exhibit 2, in turn, lists a series of named entities and also includes "any other investments or investment vehicles with respect to which Chatterjee provides investment advice to any of Soros, the Soros Affiliates" and, inter alia, QIP or its affiliates. (Klotz Decl. Ex. 70.) While Plaintiffs provide a portion of the deposition testimony of SFM LLC's Rule 30(b)(6) witness Gavin Murphy indicating that C-S Aviation was generally considered an "investment," they bring forth no evidence to support the second requirement under Exhibit 2 that Chatterjee provided investment advice as to C-S Aviation. Moreover, Exhibit 3 also refers to

Chatterjee's "investment in C-S Aviation," underscoring the importance of the advice portion of Exhibit 2. Thus, Exhibit 2 does not serve to transfer control to Soros. Instead, pursuant to Exhibit 3, control of C-S Aviation was passed to SFM LLC.

Plaintiffs then point to testimony suggesting that Soros and employees at SFM LLC did not view C-S Aviation as a separate entity from the aircraft leasing business. (SF ¶¶ 269, 282, 295-97.) Soros testified that he was not aware that the aircraft leasing business "had a separate and distinct company named C-S Aviation." (SF ¶ 269.) One of SFM LLC's employees said that he did not recognize a distinction between funding C-S Aviation and the aircraft leasing business because it was part of the same investment. (SF ¶ 282.) Another employee was unaware of many of the specifics of C-S Aviation, including its name and who owned it. (SF ¶ 295-97.)

But this testimony only goes to show that C-S Aviation may not have been treated as distinct from SFM LLC or the other entities making up the aircraft leasing business. It is not sufficient to raise a triable issue that C-S Aviation was not viewed as separate from Soros, and Plaintiffs provide no additional testimony that makes that connection explicit.

Plaintiffs attempt to save their claims by citing to Jet Star and NetJets. Neither commands a different result. In Jet Star, the court noted in a footnote that "triable issues of fact

exist as to whether certain SFM employees functioned as Soros and Chatterjee's agents, and operated CS Aviation for Soros and Chatterjee's personal benefit." Jet Star, 2006 WL 2270375, at *7 n.18. For that reason, the court concluded it would not be necessary to first pierce the corporate veil to reach SFM LLC. See id. However, the court did not cite authority for that proposition, and it is at odds with the respect owed to the corporate form generally and to SFM LLC's corporate identity specifically. See Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC, 861 F. Supp. 2d 344, 376 (S.D.N.Y. 2012) ("[A] plaintiff seeking to persuade a Delaware court to disregard corporate structure faces a difficult task." (internal quotation marks omitted)). Moreover, the one case that cites Jet Star for that proposition involves an absentee owner and his proxy within the same company. See Ridge Clearing & Outsourcing Solutions, Inv. v. Khashoggi, No. 07 Civ. 6611, 2011 WL 3586455, at *7–10 (S.D.N.Y. Aug. 12, 2011). Thus, while the SFM LLC's employees' actions could implicate Soros through SFM LLC, their actions do not tie Soros directly to C-S Aviation.

As for NetJets, while the court considered payments made to and from other entities the defendant controlled, there are at least two facts that distinguish it from this case. First, none of the other companies had a business relationship with the company that was allegedly the defendant's alter ego. See

NetJets, 537 F.3d at 180–81.  Here, C-S Aviation had a business relationship with the SPVs because it was a party to the Management Agreements with them.  Second, in NetJets, the defendant owned the other companies he made payments through. See id.  Here, Defendants only indirectly own the Holding Companies and SPVs through the Investors.

With the above in mind, the Court now turns to Plaintiffs' evidence meant to show that Soros and Chatterjee were a "single economic entity" with C-S Aviation.

## 1. Undercapitalization

The Court will assume for the sake of this motion that C-S Aviation was undercapitalized but will set forth Plaintiffs' evidence nevertheless.  Plaintiffs assert that C-S Aviation was undercapitalized because Chatterjee only paid $100 for $1,000 shares when establishing C-S Aviation. (SF ¶¶ 245, 247.) Chatterjee also provided loans, noted on the general ledger, to help cover some of C-S Aviation's expenses. (SF ¶¶ 107–09, 307–08.)  Plaintiffs also point to testimony from Soros where he suggested that he was more concerned with the aircraft leasing business making a profit than C-S Aviation being profitable. (SF ¶ 270.)  Even accepting the above as adequate, undercapitalization alone is insufficient to pierce the corporate veil. See In re BH S & B Holdings LLC, 420 B.R. 112, 136 (Bankr. S.D.N.Y. 2009).

## 2. Disregard of Corporate Formalities

As for disregard of corporate formalities, much of Plaintiffs evidence is premised on their mistaken belief that the Restructuring Agreement transferred control of C-S Aviation to Soros.  Plaintiffs present evidence, by way of deposition testimony, that SFM LLC employees — Frank Sica, Colin Raymond, and Michael Pruzan — exercised control over C-S Aviation and made decisions that should have been approved by the board of directors, despite not being officers of the company and only Raymond being a director.  But that evidence actually underscores that at most SFM LLC dominated C-S Aviation, not Soros or Chatterjee.

Plaintiffs also claim that there was only one board of director's meeting documented in the C-S Aviation minute book, and that no directors were present at that meeting (SF ¶¶ 302–03.)  The minute book contains, however, several unanimous written consents up through July 2000. (SF ¶ 301.)  Unanimous written consents are appropriate under C-S Aviation's by-laws and Del. Code Ann. tit. 8, § 141(f).  The absence of consistent board minutes is a factor that a jury could consider in weighing the sufficiency of the evidence.

At this point, however, the Court notes that even looking at this evidence in the light most favorable to Plaintiffs, they have only presented facts that are "material" in that they could

affect the outcome of the case. That C-S Aviation was undercapitalized and failed to keep minutes are factors that a jury could weigh in deciding whether to pierce the corporate veil. However, this evidence does not yet demonstrate a "genuine" dispute because alone it is not sufficient to allow a rational trier of fact to return a verdict for Plaintiffs. Whatever this evidence may say about C-S Aviation as a "distinct entity" it is inadequate to show that Soros and Chatterjee, as opposed to SFM LLC or the other entities that make up the aircraft leasing business, did not treat it as a distinct entity. See NetJets, 537 F.3d at 177 ("Stated generally, the inquiry initially focuses on whether 'those in control of a corporation' did not 'treat[ ] the corporation as a distinct entity' . . . ." (quoting Irwin & Leighton, Inc. v. W.M. Anderson Co., 532 A.2d 983, 989 (Del. Ch. 1987) (first alteration in original)).

### 3. Commingling

Turning to the evidence regarding commingling, the Court notes that Plaintiffs provide no evidence that Soros or Chatterjee commingled their own funds with those of C-S Aviation. See also Jet Star, 2006 WL 2270375, at *5 ("Plaintiff has failed to demonstrate that Soros or Chatterjee received any assets from CS Aviation or benefited from the transfer of any assets to Deutsche Bank.") It is also worth noting that there

are no allegations that SMF LLC commingled its finances with C-S Aviation.

Plaintiffs instead point to what they characterize as commingling of C-S Aviation's funds with other entities in the aircraft leasing business. This was sometimes accomplished by C-S Aviation transferring money from one SPV to pay the obligations of another SPV. Other times C-S Aviation would transfer its own money to pay the obligation of an SPV. These transfers were duly marked on the ledgers of the transferring and receiving entities as "due to" or "due from." (SF ¶ 80.) Although Plaintiffs speculate that the transfers may not always have been marked as such, they point to no such instances.

Plaintiffs claim that all of these transfers were void because they violated provisions in the SPVs' LLC Agreements that required the SPVs "be managed and administered exclusively outside of the United States." (SF ¶ 224.) While that language does appear in the LLC agreements, Plaintiffs are wrong about its effect. The agreements limit the powers of the manager appointed by the SPV. (Klotz Decl. Ex. 37.) The manager was an entity called Curacao Corp. Co N.V., not C-S Aviation. (Id.)

Plaintiffs also allege that C-S Aviation transferred money from the SPVs' and Holding Companies' Deutsche Bank accounts to C-S Aviation's own account at another bank to avoid Deutsche Bank seizing the funds after defaulting on the Credit Agreement.

Plaintiffs claim that money was C-S Aviation "dividend'd" money. Although C-S Aviation's president, Jim Walsh, testified that money was at times "dividend'd up" to the aircraft owners (SF ¶ 338.), he also clarified that C-S Aviation did not pay dividends to anybody. (Klotz Decl. Ex. 123 at 186.) Rather, the dividend was paid directly by the aircraft owners to the Investors. (Id.)

Having considered Plaintiffs evidence as to the commingling of funds, the Court concludes that it does not support the existence of a disputed material fact. None of the evidence suggests that Soros or Chatterjee commingled their own funds with that of C-S Aviation. Nor does it suggest that Soros or Chatterjee directed those transfers. Even Plaintiffs characterize the transfers as done "[u]nder the management of SFM." (Pl. Mem. 16.)

### 4. Siphoning

The Court now addresses whether Soros and Chatterjee siphoned money from C-S Aviation. Plaintiffs allege that Soros and Chatterjee siphoned $947,000 from C-S Aviation by waiving a sales fee that instead went to QIP. According to Plaintiffs, Chatterjee and Colin Raymond waived the fee. Plaintiffs assert that this benefited Soros personally because he had guaranteed QIP's losses on securitization, so this reduced the amount for which he was on the hook. (SF ¶ 346–47.) They present no

evidence that Soros was involved in the decision such that he can be said to have siphoned the funds.

Moreover, neither Soros nor Chatterjee received any direct benefit. Chatterjee did not even receive an indirect benefit because Chatterjee had no interest in QIP. Soros, who did not make the decision to waive the fee, only had a 15 percent interest in QIP at the time. Plaintiffs have not presented sufficient evidence to demonstrate the existence of a disputed material fact as to siphoning.

Considering all the evidence presented by Plaintiffs as to the "single economic entity" prong of the veil-piercing analysis, the Court concludes that a rational trier of fact could not return a verdict in Plaintiffs' favor because they have failed to show that Soros and Chatterjee personally dominated C-S Aviation. Plaintiffs having failed to present sufficient evidence on the first prong, the Court need not consider whether Plaintiffs have satisfied the second prong or whether due process requires litigation of the claims underlying the default judgment. Defendants are therefore entitled to summary judgment on the veil-piercing claims against them. The motions concerning the expert reports are denied as moot.

### III. Conclusion

For the foregoing reasons, Defendants' motion for summary judgment is granted. Defendants' motion to strike portions of Bienenstock's expert report and Plaintiffs' motion to strike portions of Subramanian's expert report are denied as moot.

The Clerk is directed to remove these two cases from the docket of this Court.

**SO ORDERED.**

Dated:    New York, New York
            March 31, 2015

                                         John F. Keenan
                             United States District Judge